IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

FEDERAL TRADE COMMISSION,          )
          Plaintiff,               )
                                   )
          v.                       )  Civil Action No. 97-1278
                                   )
DAVISON ASSOCIATES, INC.,          )
et al.,                            )
          Defendants.              )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is an action under section 13(b) of the Federal Trade Commission Act, 15 U.S.C.A. § 53(b). The Federal Trade Commission (the "Commission") alleges that defendants Davison Associates, Inc., Manufacturer's Support Services, Inc., George M. Davison, III, Gordon Davison, and Barbara Miele-Davison, have engaged in deceptive practices in connection with their invention promotion business in violation of section 5 of the Federal Trade Commission Act. 15 U.S.C.A. § 45(a). Plaintiff seeks a permanent injunction and ancillary equitable relief.

A bench trial began on June 20, 2005. After three weeks of testimony, the parties filed proposed findings of fact and conclusions of law for the court's consideration. The parties have made all submissions and the court is prepared to set forth its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, and render its judgment.

I.    FINDINGS OF FACT

The following facts were not in dispute:

1.    The court has subject matter jurisdiction over plaintiff's
      claims pursuant to 28 U.S.C. A. §§ 1331, 1337(a), and 1345,
      and 15 U.S.C.A. §§ 45(a) and 53(b).

2.    Venue is proper under 28 U.S.C.A. §§ 1391(b) and (c) and 15
      U.S.C.A. § 53(b).

3.    Defendants' course of trade is in or affecting commerce,
      within the meaning of Section 4 of the Federal Trade
      Commission Act, 15 U.S.C.A. § 44.

4.    The Commission brought this case against two corporate and
      four individual defendants on July 15, 1997.

5.    The two corporate defendants are: (1) Davison & Associates,
      Inc., now known as Davison Design and Development, Inc.
      ("Davison"); and (2) Manufacturer's Support Services, Inc.
      ("MSSI").

6.    The four individual defendants are: (1) George M. Davison
      III (President and CEO of Davison); (2) Thomas Dowler (who
      is no longer involved in this matter); (3) Gordon M.
      Davison (an employee of Davison and officer of MSSI); and
      (4) Barbara Miele-Davison (an employee of Davison until
      2002).

2

7.  A finding of liability against Davison will result in the three remaining individual defendants, and MSSI, being found individually liable under the Federal Trade Commission Act.

8.  On July 15, 1997 this court entered a Temporary Restraining Order ("TRO"), which was extended by stipulations of the parties dated July 18, 1997, July 23, 1997, and July 30, 1997.

9.  Pursuant to the TRO, Davison was forced to make certain changes to its sales and marketing materials, and to the general way that it did business. Davison was specifically prohibited from making the misrepresentations alleged in the Amended Complaint.

10. Since 1989 Davison has been in the business of selling services to amateur inventors.

11. Defendants advertise their services in the classified section of magazines, and on-line. After a consumer contacts defendants, defendants send an initial form on which the consumer gives a general description of his invention.

12. Both Pre-Complaint and Post-Complaint, defendants offer services to about 66% of the consumers sending in an initial form.

3

13. Defendants' services have always been sold in two phases.

14. Pre-Complaint, the first phase consisted of a Research Agreement. Under the Research Agreement, defendants would prepare a portfolio that included a patent search, an engineer's review of feasibility, a conceptual drawing, industry related data, and a search of competing products. The cost of this service was less than $800.00.

15. Pre-Complaint, defendants also offered expanded first-phase services, which included a color rendering Virtual Reality Presentation. This expanded service cost more than $3,500.

16. Pre-Complaint, more than half of the time defendants would conclude at the end of the first phase that the consumer should move forward with commercialization of his product idea. Defendants stopped using the "should be commercialized" recommendation after the Commission filed its Complaint.

17. Pre-Complaint, phase two of defendants' services consisted of a Product Representation Agreement under which defendants attempted to locate a corporation interested in licensing the consumer's product idea. This agreement had a term of two years. The agreement could be purchased on an hourly basis, or by paying a flat fee, ranging from $8,000.00 to $12,000.00, plus a percentage of royalties.

4

The cost of creating production drawings or a prototype for submission to corporations was included in this agreement. The Agreement contained an express acknowledgment that the consumer had not been promised financial gain or profits.

18.  Post-Complaint, phase one of defendants' services consist of two agreements: a Pre-Inventegration Services Agreement at a cost of approximately $700.00, and a Contingency Agreement, at a cost of 10% of future licensing royalties.

19.  The Pre-Inventegration Agreement results in a portfolio containing product research, a patent design search, and a provisional patent application. This portfolio is similar to the one provided under the Research Agreement, Pre-Complaint. The Pre-Inventegration Agreement states that there are no guarantees of financial gain and that the purpose of the research is not to evaluate market potential or patentability.

20.  The Contingency Agreement is the agreement under which defendants attempt to obtain a license for the consumer's product with a corporation. The Contingency Agreement states that the consumer will be responsible for obtaining a virtual reality presentation and/or prototype of his idea for submission to corporations. The agreement states that the consumer can obtain these items either from defendants

5

or another source, subject to defendants' approval. This agreement also contained a statement that no license is guaranteed and that the majority of products are not successfully licensed.

21. Post-Complaint, phase two of defendants' services consist of a Production Sample Presentation Agreement under which defendants agree to produce a virtual reality model and/or prototype of the consumer's idea for presentation to corporations. This agreement can be purchased at an hourly rate, or for a flat fee, ranging from $8,000.00 to $14,000.00, plus a percentage of future royalties. This phase two agreement is offered once a corporate match is found for the consumer's product idea, which happens about 80% of the time. This agreement contains statements that there are no guarantees of financial success.

22. Less than one percent of defendants' revenues come from royalty income.

23. Both Pre-Complaint and Post-Complaint contracts contain integration clauses stating that the agreement constitutes the entire agreement between the parties and that any verbal agreements are null and void.

24. The American Inventor's Protection Act, 35 U.S.C.A. § 297 ("AIPA"), requires invention-promotion firms to make the

6

following disclosures before selling their services: (1) total number of inventions evaluated for commercial potential in the past 5 years, as well as the number of these inventions that received positive evaluations, and the number that received negative evaluations; (2) the total number of customers who have contracted with the invention promoter in the past 5 years, not including customers who have purchased, among other things, research or other non-marketing services; (3) the total number of customers known by the invention promoter to have received net financial profit as a direct result of the invention promotion services; (4) the total number of customers to have received licensing agreements as a direct result of the invention promotion services; and (5) the names and addresses of all previous invention promotion companies with which the invention promoter or its officers have been affiliated in the previous 10 years.

25.    In 2002, defendants' AIPA disclosure stated:

> Client acknowledges that Davison has assisted eight hundred and seventeen clients wanting licensing services in the last five years. Because Contingency Agreements last for six months, Davison is unable to determine if a Client has licensed or marketed his/her product idea or received financial gain after the expiration of the Contingency Agreement. However,

7

> Davison is aware of thirty projects that
> have been licensed and ten that have
> resulted in financial gain to the
> project owner since 1990. Davison is
> also aware that one hundred twenty
> projects are under corporate licensing
> review.

26. In the first half of 2005, defendants received 40,516
    idea submissions from consumers. From these,
    defendants offered phase one Pre-Inventegration
    Services Agreements to 26,309, 4,371 of whom purchased
    the phase one services. Defendants then offered phase
    two Production Sample Presentation Agreements to 3,455
    of the 4,371 phase one clients, 920 of whom purchased
    and fully paid for the phase two services.

27. In its Amended Complaint, the Commission alleged that
    defendants made the following six false and misleading
    representations, either expressly or by implication, in
    connection with the sale of their services:

    (a) Consumers who buy defendants' invention-
    promotion services stand a reasonably good chance
    of realizing financial gain.

    (b) Defendants' invention-promotion services helped
    many of their customers' invention ideas become
    profitable products.

8

(c) Defendants' invention-promotion services helped some or more of the following invention ideas become profitable products: Bark Buddies, the Spot-Lite, the Snag-Buster, the Puzzle Sorter, and the EnviroGolf.

(d) Defendants have a vast network of corporations with whom they have ongoing relationships and regularly negotiate successful licensing agreements.

(e) Defendants' invention marketing services are necessary for consumers to license their invention ideas.

(f) Defendants prepare objective and expert analyses of the patentability and marketability of consumers' invention ideas.

The following facts were in dispute, and the court finds, by a preponderance of the evidence, as follows:

A.    Reasonably Good Chance of Financial Gain

28.   Based on the overall, common sense, net impression on a reasonable consumer, defendants falsely represent, both directly and by implication, that consumers who buy their services stand a reasonably good chance of realizing financial gain by:

> (A) representing that they are selective as to whom they offer services based on the quality, value, and/or originality of a consumer's idea;
>
> (B) representing that they have a genuine stake in the consumer's invention through royalties, when in fact, fees charged, and not royalties collected, are the main source of defendants' income; and
>
> (C) misrepresenting their track record.

29.   Both Pre-Complaint and Post-Complaint, defendants make express and implied statements that create the overall, common sense, net impression on a reasonable consumer that they are selective about those to whom they offer services.  In fact, defendants offer phase one research services to 66% of the consumers submitting ideas. Pre-Complaint, more than 50% of consumers purchasing

10

phase one services were offered phase two services. Post-Complaint, approximately 80% of consumers purchasing phase one services are offered phase two services.

30. Defendants' numerous statements, both Pre-Complaint and Post-Complaint, regarding the value, desirability, or originality of, or excitement surrounding a consumer's idea create the overall, common sense, net impression in a reasonable consumer that defendants have selected this consumer's particular idea, to the exclusion of many others. This, in turn, creates the overall, common sense, net impression in a reasonable consumer that there is some reasonable chance of financial success for those ideas that are specially selected. It is reasonable for a consumer to assume that an idea that has been evaluated and selected for further work to the exclusion of other ideas must have some possibility of success.

31. While defendants have curtailed their sales language regarding their enthusiasm for, or the originality of an idea, and no longer refer to an idea as having passed "review board" scrutiny, defendants still try to convince consumers that they select a limited number of

11

ideas for further work, when the vast majority of consumers are offered further services. In fact, Post-Complaint, defendants offer phase two services to 30% more consumers than they did Pre-Complaint.

32. Both Pre-Complaint, and Post-Complaint, defendants create the overall, common sense, net impression of a reasonably good chance of financial gain through contingency arrangements. Although contingency arrangements are not per se illegal, defendants' sales techniques regarding the contingency arrangement create the overall, common sense, net impression on a reasonable consumer that defendants have a shared interest in the consumer's idea.

33. For example, Post-Complaint, a reasonable consumer would conclude that a company is only going to take a shared interest in an idea, and "work for free" under the Contingency Agreement, if an idea has some reasonable possibility of financial success. In reality, and unbeknownst to the consumer, there is no real shared interest, because royalty payments from consumer licenses are a minuscule portion of defendants' revenues. Defendant's greatest source of income is the fees charged for prototyping and virtual

12

reality services, which, in practice, must be purchased in order to proceed to the licensing stage.

34. Both Pre-Complaint and Post-Complaint, defendants misrepresent their track record. The overall, common sense, net impression on a reasonable consumer of defendants' track record overstates the reasonable possibility of financial gain. In particular:

(a) Defendants misrepresent their track record in their AIPA disclosure by hiding the information in a paragraph about how notices are to be sent and by including extraneous information, such as projects "under corporate licensing review". They also create the impression of greater success by not reporting the total number of phase one customers buying a Pre-Inventegration portfolio, which is in the thousands. Although research is excepted from AIPA reporting requirements, as defendants have structured their business Post-Complaint, this initial report is an integral part of defendants' licensing services. From defendants' first contacts with consumers, the phase one Pre-Inventegration Services Agreement is characterized as the first step in negotiating with corporations

13

for a license. For example, the research conducted under the Agreement is described as "needed" in order to proceed to licensing. A sales script says that defendants need to get the research "out of the way" so they can start "sourcing corporations" for licensing. Another sales script to be used before the work under the Pre-Inventegration Services Agreement has even been completed states there is good news for the consumer about "target corporations". Under these circumstances, research is inseparable from the licensing part of defendants' business. Therefore, defendants' failure to disclose that thousands of people are provided with Pre-Inventegration portfolios, yet, at best, only dozens obtain licenses, significantly misrepresents their track record. Although defendants have not been charged with violating the AIPA, and it is unclear how the research exception of the AIPA is to be interpreted, the above is evidence of how defendants shew their track record in order to imply a reasonably good chance of financial gain.

(b) Defendants also misrepresent their track record by contending that the Contingency Agreement and Production Sample Presentation Agreement are unrelated. As a result, defendants conclude that any consumer who made $1.00 in royalties realized a profit because the Contingency Agreement is "free". However, these two agreements are closely intertwined and the significant cost of the Production Sample Presentation Agreement must be factored into profitability in order to give consumers truthful information regarding defendants' track record. Defendants' current Operations Manual characterizes prototyping services as "necessary" to the overall licensing services provided by defendants. In addition, the Inventegration "flow chart" included with defendants' introductory marketing materials includes the purchase of prototyping services as a step on the path to obtaining a corporate license. The consumer must buy the Production Sample Presentation Agreement to fulfill the Contingency Agreement and proceed to the only possible money-making step of defendants' services - licensing.

15

The two agreements are intertwined. Although, when correctly considered in determining profitability, this would cause only a slight change in the number of consumers who realized a profit this is further evidence of defendants' attempts, even Post-Complaint, to falsify their track record.

(c) Pre-Complaint, defendants misrepresented their track record in the "numbers letter" by using the above, and other techniques, such as including licenses obtained by people affiliated with defendants.

35. The disclaimers used by defendants, both in written and oral form, to the effect that there are no guarantees of financial success or of a license are not sufficiently prominent and unambiguous and do not clearly, conspicuously, and directly address the misrepresentations made regarding defendants' track record, and are, therefore, ineffective.

B.    Many Products Are Profitable

36. Based on the overall, common sense, net impression on a reasonable consumer defendants do not falsely represent that their invention-promotion services have

16

helped "many" of their customers' invention ideas become profitable products. Regardless of how defendants inflate their track record, there is no reasonable implication from defendants' overall marketing and sales materials that "many" consumers have made a profit as a result of using their services.

37. It is always clear to the reasonable consumer that success and profitability are the exception, rather than the rule. While defendants may use unlawful techniques to convince consumers that they have the rare idea that falls into the exception category, they do not state or imply that "many" people make a profit. Rather, their sales techniques rely on convincing the consumer that the opposite is true.

C. Profitability of Specific Products

38. Based on the overall, common sense, net impression on a reasonable consumer defendants misrepresented that their invention-promotion services helped some, or more, of the following invention ideas become profitable products: Bark Buddies, the Spot-Lite, the Snag-Buster, the Puzzle Sorter, and the EnviroGolf. A reasonable consumer would conclude that "success story"

17

products specifically featured by defendants as having been advertised on MTV, sold "all over the world", and purchased by "thousands of parents" have some level of financial success. While it is true that defendants never use the term "profitable" in reference to these particular products, based on the overall, common sense, net impression, a reasonable consumer would equate such specific statements of successful sales and marketing with profit.

39. Furthermore, the statements that defendants make about at least some of these products are blatantly false. For example, while defendants claim that the Puzzle Sorter has been sold worldwide, defendants' records reflect no actual sales of this product in the United States, or elsewhere.

40. Even though defendants have stopped referring specifically to Bark Buddies, the Spot-Lite, the Snag-Buster, the Puzzle Sorter, and the EnviroGolf, defendants still perpetuate consumers' misunderstandings regarding the profitability of specific products. For instance, defendants refuse, to this day, to answer consumer inquires regarding the exact profitability or success of specific products.

18

Post-Complaint sales scripts instruct staff members to refuse to answer such questions on the basis of confidentiality concerns.

D.   Special Access to Corporations

41.   Based on the overall, common sense, net impression on a reasonable consumer defendants falsely represent that they have a vast network of corporations with whom they have ongoing, special relationships, and with whom they regularly negotiate successful licensing agreements. Pre-Complaint, defendants told consumers explicitly that they worked directly with manufacturers, had close personal contacts, and cut through the "red tape" and the "old boys' network" to obtain licenses for their clients.   Although this may be technically true of a handful of smaller companies, defendants implied that they had such relationships with hundreds of large, nationally known companies, which they did not.

42.   Even Post-Complaint defendants state, in a sales script used early in the consumer's relationship with defendants, that because defendants develop products for companies on an ongoing basis they have the ability to present outside concepts where the average person

19

would not. Again, although this may be literally true of a handful of companies, the overall, common sense, net impression on a reasonable consumer of defendants' marketing techniques, still today, is that they are selling special access to hundreds of companies, when in fact there is little, if any, special access.

43. Defendants claim to have close working relationships with specific companies when defendants' submission procedures do not even meet the company's requirements for the submission of unsolicited ideas.

44. Defendants create the impression of special access by stating that they meet, regularly, with numerous corporations to present new ideas to them. Even Post-Complaint, in the Inventegration "flow chart", defendants imply that presentations and meetings occur in person. The evidence at trial showed that this rarely happens.

45. Defendants' misrepresentations regarding special access are exacerbated by false claims of confidentiality. Even Post-Complaint, when consumers ask for details regarding a company's interest in their idea before agreeing to purchase the Production Sample Presentation Agreement, defendants refuse, citing confidentiality

20

concerns. Such confidentiality claims are suspect because all defendants have done at that point is pull the name of a company that makes the same type of products as the consumer's invention from their computer database.

46. Even Post-Complaint, through the corporate montage, defendants imply relationships with companies that have not even registered with defendants as being willing to accept new product ideas from them.

E.  Necessity of Services

47. Based on the overall, common sense, net impression on a reasonable consumer defendants misrepresent that their invention marketing services are necessary for consumers to license their invention ideas to corporations. Both Pre-Complaint and Post-Complaint, defendants explicitly state that their virtual reality/prototype product presentation portfolios will get the consumer's idea "taken seriously" and are a "necessity" when working with large corporations.

48. Although a reasonable consumer expects a salesperson to portray his products in the best light possible and to try to convince the consumer that he is selling

21

something that the consumer must have, defendants claim
to have expertise and experience in licensing products
to large corporations. They use this perceived
position of superior knowledge over the consumer to
convince the consumer that when a salesperson says that
something is needed in order to proceed, it is.

F. Patentability and Marketability Analysis

49. Based on the overall, common sense, net impression on
a reasonable consumer we find that, Pre-Complaint,
defendants misrepresented that they prepared objective
and expert analyses of the patentability of consumers'
invention ideas.

50. Pre-Complaint, defendants stated that a patent search
was conducted in order to "understand the viability of
your new product ideas". Following this statement,
defendants stated that their registered patent agent
conducted the search and that "only a registered patent
attorney or patent agent can advise you whether
protection of your idea or invention is available under
the patent...laws." The report went on to summarize
various forms of intellectual property protection and
to warn the consumer of certain actions that could

22

jeopardize those rights.   The overall, common sense, net impression of this presentation of the patent search on a reasonable consumer is that defendants' patent agent is qualified to determine patentability, and did so in this case.   Any attempted disclaimers were ineffective.

51.   Based on the overall, common sense, net impression on a reasonable consumer we find that, both Pre-Complaint and Post-Complaint, defendants misrepresent that they prepare objective and expert analyses of the marketability of consumers' invention ideas.

52.   Both Pre-Complaint and Post-Complaint, defendants include a section in their research report regarding the presence of competing, or conflicting, products currently on the market. Defendants explain that "[i]t is imperative that our firm allocate a substantial amount of time to discover similar or competing products in the marketplace" in order to assist in "making decisions in the future." Sales calls also address the presence of similar products in the marketplace, and/or the uniqueness of the consumer's product.   These statements create the overall, common sense, net impression on a reasonable consumer that

defendants are studying the market in order to arm themselves, and the consumer, with information needed to assess the potential market for a product.

53.   Although defendants state that no one can predict how a product will actually sell until it is for sale in the marketplace, that is not an effective disclaimer. Defendants are not accused of guaranteeing sales, but of providing consumers with purported objective and expert analysis of marketability.   The purported disclaimer does not dispel the overall impression that defendants are gathering data about the market in order to assist defendants and the consumer in making an educated guess as to the possible market potential of a product.

54.   Based on the overall, common sense, net impression on a reasonable consumer we find that, Post-Complaint, defendants do not misrepresent that they prepare objective and expert analyses of the patentability of consumers' invention ideas.   Rather, defendants now explicitly state that they are not performing this service.       Because       defendants    now    clearly, conspicuously, and directly disclaim that they give patentability assessments, and because the disclaimer

24

is prominent, unambiguous and presented at the same time that the patent search is presented, the overall impression of the communication becomes non-deceptive, and the disclaimer is effective.

II.   CONCLUSIONS OF LAW

1.   The Federal Trade Commission Act prohibits deceptive acts or practices in or affecting commerce.   15 U.S.C.A. § 45(a)(1).

2.   Whether a particular practice has a tendency to deceive or mislead is an impressionistic determination more closely akin to a finding of fact than to a conclusion of law.   See Beneficial Corp. v. F.T.C., 542 F.2d 611, 617 (3d Cir. 1976).

3.   To establish liability under section 5 of the Federal Trade Commission Act, the Commission must establish that there was a material representation which was likely to mislead consumers acting reasonably under the circumstances.   See F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003).

4.   To be actionable a misrepresentation or practice need not be made with an intent to deceive.   See Beneficial Corp., 542 F.2d at 617.

25

5.  A practice or statement is material if it contains
    information that is important to a consumer's
    purchasing decision such as information relating to the
    economic viability of a transaction or the central
    character of the product or service. F.T.C. v. Five-
    Star Auto Club, Inc., 97 F.Supp.2d 502, 529 (S.D.N.Y.
    2000) (citing cases).

6.  In determining whether a practice is likely to mislead,
    the fact finder must consider the overall, common
    sense, net-impression of the practice on a reasonable
    consumer. Beneficial Corp., 542 F.2d at 617; Am. Home
    Prod. Corp. v. F.T.C., 695 F.2d 681, 687 (3d Cir.
    1982). The practice must be viewed as a whole without
    emphasizing isolated words or phrases. Beneficial
    Corp., 542 F.2d at 617.

7.  Disclaimers or curative language must be "sufficiently
    prominent and unambiguous" such that the overall net-
    impression of the communication becomes non-deceptive.
    Removatron, Int'l Corp. v. F.T.C., 884 F.2d 1489, 1497
    (1st Cir. 1989).

8.  The Commission has found that integration clauses do
    not shield defendants where their misrepresentations

26

have resulted in consumer injury. <u>In re Amrep Corp.</u>, 102 F.T.C. 1362, 1667-68 (1983).

9.   Under section 13(b) of the Federal Trade Commission Act, a court may grant permanent injunctive relief where the violation is ongoing or there is a cognizable danger of recurrent violation. <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1953). In determining whether there is a danger of recurrence, a court may consider the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of past violations. <u>Id</u>.

10.  The authority to grant a permanent injunction includes the authority to order any other ancillary equitable relief necessary to effectuate the exercise of the powers granted under section 13(b). <u>F.T.C. v. Febre</u>, 128 F.3d 530, 534 (7th Cir. 1997); <u>F.T.C. v. Gem Merch. Corp.</u>, 87 F.3d 466, 468-69 (11th Cir. 1996); <u>F.T.C. v. Amy Travel Service, Inc.</u>, 875 F.2d 564, 571 (7th Cir. 1989).

11.  Ancillary equitable relief may take the form of disgorgement of the full amount lost by customers, without regard to defendant's profits.   <u>Commodity Futures Trading Comm'n v. Am. Metals Exchange Corp.</u>,

27

991 F.2d 71, 77 (3d Cir. 1993); Febre, 128 F.3d at 537;
F.T.C. v. Medicor LLC, 217 F.Supp.2d 1048, 1057-58
(C.D. Cal. 2002).

12.   We find that defendants' practice of stating or
implying that consumers have a reasonably good chance
of realizing financial gain is material to a consumer's
purchasing decision and is likely to mislead consumers
acting reasonably under the circumstances based on the
overall, common sense, net impression of the practice.

13.   We find that defendants' practice of stating or
implying that defendants' services helped particular
products become profitable is material to a consumer's
purchasing decision and is likely to mislead consumers
acting reasonably under the circumstances based on the
overall, common sense, net impression of the practice.

14.   We find that defendants' practice of stating or
implying that they have a vast network of corporations
with whom they have special relationships is material
to a consumer's purchasing decision and is likely to
mislead   consumers   acting   reasonably   under   the
circumstances based on the overall, common sense, net
impression of the practice.

28

15.  We find that defendants' practice of stating or
     implying that their invention marketing services are
     necessary for consumers to license their invention
     ideas to companies is material to a consumer's
     purchasing decision and is likely to mislead consumers
     acting reasonably under the circumstances based on the
     overall, common sense, net impression of the practice.

16.  We find that defendants' practice of stating or
     implying that they prepare objective and expert
     analyses of the marketability of a consumer's invention
     idea is material to a consumer's purchasing decision
     and is likely to mislead consumers acting reasonably
     under the circumstances based on the overall, common
     sense, net impression of the practice.

17.  We find that defendants' Pre-Complaint practice of
     stating or implying that they prepare objective and
     expert analyses of the patentability of a consumer's
     invention idea is material to a consumer's purchasing
     decision and is likely to mislead consumers acting
     reasonably under the circumstances based on the
     overall, common sense, net impression of the practice.

18.  We find that the integration clauses in defendants'
     contracts do not shield them from liability because

29

this case is not controlled by state contract law, and because consumer injury resulted from defendants' misrepresentations.

19. Permanent injunctive relief is appropriate in this case because there are ongoing violations and there is a cognizable danger of recurrent violation. Even after the court issued a Temporary Restraining Order, which was later extended by stipulation, defendants continued to engage in deceptive practices, albeit in slightly different forms. Based on this past pattern of conduct, there is a very real danger that defendants will alter their business again, yet continue to engage in wrongdoing.

20. In order to effectuate the exercise of granted powers, we order other ancillary equitable relief in the form of consumer redress in the amount of $26 million. This amount represents revenues earned by defendants Pre-Complaint in the amount of $8 million. This amount also represents the $18 million that Mr. Davison testified defendants earned in 2004. Plaintiffs presented insufficient evidence to establish defendants' earnings in other years. Even though discovery was not available regarding those years,

30

plaintiffs could have presented some evidence regarding earnings through defendants' officers or agents, or otherwise. The court has no evidentiary basis to make a finding of any revenues or income in the years since the Complaint was filed, other than in 2004. Regardless, being an equitable remedy, we find that this amount is appropriate to provide consumers with some form of financial recovery, while not exacting a penalty on defendants.

An Order for a Final Judgment and a Permanent Injunction follow.

BY THE COURT:

s/Gary L. Lancaster , J.
The Honorable Gary L. Lancaster,
United States District Judge

Dated: March 17, 2006

cc: All counsel of record

31